UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
JACKSONVILLE DIVISION

UNITED STATES OF AMERICA
ex rel. ASHOK KOHLI,

    Plaintiff-Relator,

v.

SMART PHARMACY, INC., a Florida
corporation, GREGORY H. BALOTIN
and WILLIAM C. SCROGINS,

    Defendants.

_____/

CASE NO. 3:16-cv-387-J-39PDB
FILED UNDER SEAL

## RELATOR'S FALSE CLAIMS ACT COMPLAINT AND DEMAND FOR JURY TRIAL

Plaintiff-Relator ASHOK KOHLI (hereinafter referred to as "RELATOR"), by and through his undersigned counsel, hereby files this Complaint and Demand for Jury Trial against Defendants, SMART PHARMACY, INC., a Florida corporation, GREGORY H. BALOTIN, and WILLIAM C. SCROGINS (hereinafter collectively referred to as "DEFENDANTS") and alleges as follows:

1.    RELATOR brings this action on behalf of the United States of America against DEFENDANTS for their violation of the Federal False Claims Act ("FCA"), 31 U.S.C Sections 3729-3733.

2.    This action is not based upon allegations or transactions which are the subject of a civil suit or an administrative civil money penalty proceeding in which the Government is already a party. Nor are the allegations or transactions set forth herein substantially the same as allegations or transactions publicly disclosed (i) in a Federal criminal, civil or administrative hearing in which

S-1

the Government or its agent is a party; (ii) in a congressional, Government Accountability Office or other Federal report, hearing, audit, or investigation; or (iii) reported in the news media.

## JURISDICTION AND VENUE

3. This Court has subject matter jurisdiction under 28 U.S.C. Sections 1331 and 1345 as well as under 31 U.S.C. Section 3732.

4. All DEFENDANTS can be found, reside, or transact business in the Middle District of Florida. Additionally, nearly all of the conduct and acts set forth in this Complaint and otherwise proscribed by Section 3729 of the FCA occurred in this District. Accordingly, venue is proper in this District with respect to all claims set forth herein pursuant to 31 U.S.C. Section 3732(a) as well as 28 U.S.C. Section 1391(b)(1) and (2).

## PARTIES

5. RELATOR is and was a resident of Duval County, Florida, in the Middle District of Florida, at all times relevant to this Complaint. RELATOR was employed by Smart Pharmacy, Inc., as a licensed pharmacist from December 26, 2013 through his termination on or about March 8, 2016.

6. RELATOR is an "original source" within the meaning of 31 U.S.C. Section 3730(e)(4)(B) of the information upon which the allegations set forth in this Complaint are based, such information having been derived through RELATOR's employment by DEFENDANTS as a licensed pharmacist. RELATOR has voluntarily provided such information to the Government prior to the time of any public disclosure under Section 3730(e)(4)(A) or, in the alternative, has knowledge that is independent of, and materially adds to, any publicly disclosed allegations or transactions which may exist but of which RELATOR and undersigned counsel are presently

unaware, and RELATOR has voluntarily provided such information to the Government pursuant to Section 3730(e)(4)(B)(2) before filing this action.

7. Defendant Smart Pharmacy, Inc ("SMART") is a for-profit corporation organized under the laws of the State of Florida with its principal address at 3740 St. Johns Bluff Road, Jacksonville, Florida, in Duval County, Florida, in the Middle District of Florida.

8. Defendant Gregory Balotin ("BALOTIN") is the Chief Financial Officer of SMART and resides in Duval County, Florida, in the Middle District of Florida

9. Defendant William C. Scrogins ("SCROGINS") is the Chief Operating Officer of SMART and resides in Duval County, Florida, in the Middle District of Florida.

10. Upon information and belief, BALOTIN and SCROGINS are the sole or primary owners of SMART and directly manage and control the operations of SMART. Upon information and belief, both BALOTIN and SCROGINS were fully aware of the false and fraudulent acts identified in this Complaint, authorized the commission of such false and fraudulent acts and derived substantial financial gain from the commission of such false and fraudulent acts. In all instances, DEFENDANTS can be said to have personally acted "knowingly" as that term is defined in 31 U.S.C. Section 3729(b)(1) in that BALOTIN and SCROGINS, along with other management and authorized personnel of SMART, individually and collectively, acted with actual knowledge of the information set forth below, including but not limited to the information alleged in paragraphs 12 – 31; 33 – 35; 37 – 39; and 41 - 43 of this Complaint; or acted in deliberate ignorance of the truth or falsity of said information; or acted in reckless disregard of the truth or falsity of said information.

## FACTS

11. SMART, founded in 2007 by Defendants BALOTIN and SCROGINS, both of whom are licensed pharmacists, is a compounding pharmacy as well a retail pharmacy. The compounding pharmacy aspect of SMART's business has constituted the vast majority of its revenue in the last several years. SMART currently has two locations in Jacksonville. Its corporate headquarters are located at 3740 St. Johns Bluff Road where it maintains its executive offices, customer service, billing, and shipping departments as well as a compounding lab. Approximately 75 people are employed at that location including RELATOR, who had worked there two days a week. In or about October 2014, SMART opened a new location at 14003 Beach Boulevard, where SMART offers retail pharmaceutical services and has a new, state-of-the-art compounding lab. Approximately 20 people are employed at that location including RELATOR, who had worked there one day a week. That facility replaced the much smaller location which SMART previously had at 1650 San Pablo Road in Jacksonville.

12. Over the past several years, SMART has dramatically increased the scope of its business. Upon information and belief, its current gross annual revenue is nearly $100 million or more. The bulk of that revenue is derived from the sale of compound medications for pain, hormone therapy and scar treatments both in Florida and Georgia. SMART employs a sizable number of sales representatives who are provided by SMART with generous expense accounts in order to attract and induce physicians in the Jacksonville area, as well as in other locations in Florida and Georgia, to send their prescriptions to SMART.

13. Pharmacy compounding is the art and science of preparing personalized medications for patients. Compounded medications are made based on a prescription written by an authorized medical practitioner (usually a licensed physician) in which individual ingredients

are mixed together in the exact strength and dosage form required by the patient. This method allows the compounding pharmacist to work with the patient and the prescriber to customize a medication to meet that patient's specific needs.

14. Because compounded medications are personalized for individual patients, various federal government sponsored health care insurance programs, such as Medicare or TriCare, formerly known as the Civilian Health and Medical Program of the Uniform Services (CHAMPUS), have approved the use of compounded medications only for those individuals who have received a prescription from a licensed practitioner for that specific compounded medication. Both Medicare and TriCare contract with several large health insurance corporations, serving as fiscal intermediaries, to provide claims processing, customer service and other administrative functions to the Medicare and TriCare programs.

15. RELATOR's job was to supervise the pharmaceutical technicians who worked under him in preparing the compound formulas and to verify that the correct drugs were being shipped out or made available for customer pick up. The drugs were placed in a basket which also contained information identifying the particular drug, its National Drug Code ("NDC") number (a universal product identifier for human-consumed drugs in the United States); the method by which the prescription came into the pharmacy; the Rx number; the quantity; instructions as to its usage; the name and date of birth of the patient; the number of refills remaining; the name of the insurance carrier; the actual cost to the pharmacy of the drug and the amount of reimbursement to be paid by the carriers including any dispensing fees or co-pays as well as the net profit to SMART for each prescription. In that regard, RELATOR noticed the amount of reimbursement being paid by Medicare and TriCare or their fiscal intermediaries was absurdly high against the actual acquisition

cost of the ingredients. For example, a scar cream or pain cream that cost less than $200 was yielding a net profit as much as $6000 or more per patient per month.

16.     RELATOR worked the late shift from 1:00 pm to 9:00 pm including occasional work on Saturdays. He worked at both the Beach Boulevard and the St. Johns Bluff Road locations, where he had access to the billing department and its personnel. Generally speaking, SMART's management frowned upon the pharmacists walking into the billing area or interfacing with the billing department, but there was no management personnel present after 5:00 pm on weekdays or on Saturdays. As a result thereof, RELATOR had numerous conversations with billing personnel and became aware of many questionable or suspicious practices.

17.     RELATOR observed that all pain formula prescription forms, which were created by SMART'S billing department, had a default position of 11 refills unless the doctor indicated something less, which rarely occurred. These refills were shipped out on a 30-day basis to all Medicare and TriCare patients without first contacting the patient to get a verbal authorization. Occasionally, RELATOR would receive a phone call from the patient saying that he or she had too much pain cream supply building up at the home and asking that SMART not send any more cream. The reason for this excess was that the majority of pain creams were filled for 480 grams to be used "1 to 3 pumps (4.5 grams) 3 to 4 times a day." This was an unrealistic amount of pain cream and the patient would need to be using it consistently on a very large area of the body to use 480 grams in a month. Additionally, most of the pain creams were only good for 30 to 45 days once they were made in the compounding lab. Out-of-date medications were then replaced by SMART with a fresh shipment and billed to Medicare or TriCare or their fiscal intermediaries. In order to assuage patients who were complaining about having to absorb co-pays (a relatively small amount in contrast to the reimbursement from the carrier) for more medication than what was

required, SMART personnel advised these patients that if they chose to not to make the co-payment, SMART would not pursue them. As RELATOR learned, the prescription which designated the amount of the drug and its daily usage 3 to 4 times a day, and thus justifying a 480 gram fill, was on a Smart billing department-created, pre-printed prescription form. See paragraphs 19 through 27, *supra*.

18. RELATOR further learned that the billing department was instructed by DEFENDANTS to make sure that each insurance company, including those companies which serviced Medicare and TriCare patients, was billed for the compound that would yield the greatest amount over actual cost. These high profit yielding compounds could be changed on a monthly basis depending on the development of new formulas for essentially similar topical pain creams. The billing department made test claims on a particular formula or combination of ingredients which was designed to yield the highest profit. If the insurance company indicated it would reimburse for that formula, all patients under that insurance plan would be automatically switched to the more expensive formula, even if the patient were satisfied with the old formula and the insurance still covered the original, less expensive formula. Billing personnel were constantly encouraged by DEFENDANTS to maximize the amount of profitability to be achieved by finding the formulas which would yield the greatest differential between actual costs and the amount to be reimbursed under a particular insurance plan. This switch, however, required approval by the doctor who wrote the original prescription.

**Creation and Use of False Record or Statement Material to a False or Fraudulent Claim**

19. This approval by the doctors was routinely obtained by false and fraudulent means. The billing department would fax a document on SMART's letterhead falsely stating that "the compound formula prescribed was not permitted under this patient's insurance. Please consider the

following substitution that is covered." The recommended (and more profitable) "substitution" was listed below on that same form. The doctors, for the most part, would be unsuspecting and simply sign the form authorizing the change in prescription and fax it back to SMART as the form requested. The newly approved prescription was filled in the often excessive amount requested by SMART and provided to the patient and ultimately reimbursed at a much higher rate with the greater net profit than the older, still covered prescription. (See Exhibit 1, attached hereto).

20. Starting in or about August, 2015, when the newly approved prescription was then scanned into the computer, the SMART name and logo was removed along with the false advisement that the original compound formula was no longer covered by that patient's insurance in an effort to portray the prescription as being the product of the prescribing physician. The form also had a "default position" of 11 refills unless the doctor specifically indicated otherwise. This would be the case irrespective of the fact that the pain for which the cream was being dispensed would often be resolved within a matter of months and not require a full year's worth of medication. Invariably, the doctors would only sign the form at the bottom, without making any further specific recommendation about the number of refills.

21. A later variation of the prescription form described above was also used and sent to the doctors, once again on SMART letterhead, in an effort to falsely induce the prescribing physician to change the originally prescribed formula and choose a more profitable formula. This variation falsely advised the prescriber that a change in the formula was clinically or pharmaceutically required "in an effort to optimize therapy..." The form requested that the prescriber "please sign below to approve one of the following formulas. You will receive a fax indicating which formula was filled for your patient." The lower portion of form then stated: "Practitioner has indicated by numerical order his/her preference for dispensed compound.

Pharmacy shall dispense in the order below unless insurance or patient requests alternate formula." Ten choices of various formulas for the pain cream followed, numbered 1 through 10. The precise make up of each of the formulas was also listed. (See Exhibit 2, attached hereto).

22. A hybrid variation of the aforementioned billing department-created prescription forms was created and used by SMART. This version falsely indicated to the prescribing physician that "the compounded formula prescribed was not permitted under this patient's insurance. In an effort to optimize therapy, please sign below to approve one of the following formulas. You will receive a fax indicating what formula was filled for your patient." This billing department-created prescription form thus contained both the misrepresentation about lack of insurance coverage as reflected in Exhibit 1 and the misrepresentation about "optimizing therapy" as reflected in Exhibit 2.

23. These formulas set forth in Exhibits 1 and 2 were chosen by the billing department of SMART (and not the prescribing practitioner or the licensed pharmacist) in order to achieve maximum profitability without any regard to lack of insurance coverage on the original prescription or "optimizing therapy." In the case of Exhibit 1, the prescribing physician had little choice in affixing his or her signature, lest the physician be concerned that the patient would be denied insurance coverage for a needed medication. The representation about the original compounded being "not permitted under this patient's insurance" was, except in limited instances, false and was fully known by DEFENDANTS to be false.

24. In the case of Exhibit 2, there was no place on the form for the prescribing practitioner to reprioritize his or her order of preference and nearly all doctors simply accepted the order of preference shown on the document. The ultimate choice of which formula to use was made by the billing department. There was virtually no input from the prescribing physician,

although the prescription form clearly reads to falsely suggest otherwise. Invariably, the billing department would choose the most profitable formula for which there was coverage under the applicable insurance and would circle that particular formula. The choices set forth on that form were made by SMART's billing department without the supervision of a licensed pharmacist, which itself is a violation of standard pharmaceutical protocol.

25. The representation that these alternate formulas were being presented "in an effort to optimize therapy" was entirely false and was designed to induce the prescribing physician to simply sign at the bottom and make no other choices. With very rare exception, these faxes came back with the signature of the doctor and no other indications on the form as to preference of formula.

26. Additionally, the Exhibit 2 prescription form falsely represented that the doctor had signed off on the need for 11 refills which was often medically inappropriate since the pain for which the cream was being prescribed would often be resolved in a matter of a few months and would not require a full year's worth of medication. Unlike the Exhibit 1 prescription form, which had a default position of 11 refills unless the doctor indicated otherwise, the Exhibit 2 form authorized 11 refills with no place on the form for a different indication as to the number of refills. When the Exhibit 2 prescription form was scanned into the computer, the top portion of the document which reflected the SMART pharmacy name and logo was removed in an effort to falsely portray the prescription as being the product of the prescribing physician.

27. While the business was rapidly expanding because of the increase in the number of sales reps, SMART was busy bringing out new formulas with different ingredients to improve reimbursement. At this point SMART had provided doctors with several sets of pre-printed prescription pads with anywhere from 6 to 8 different choices of pain formulations. (See Exhibit

10

3, attached hereto). This was essentially a three-part form. The most expensive were the first 2 on most of the forms. The doctors were encouraged by SMART's sales reps to just sign all three places on the page which allowed the pharmacy to pick the most profitable formulation covered by the patient's insurance. This was sold to the doctors as a way to save the time of going back and forth in order to find a covered prescription.

28.     Unlike Exhibits 1 and 2, Exhibit 3 had no indication that it was created by SMART, although it obviously was. When Exhibit 3 was faxed back to billing, the document would be cut by billing to show only the drug supposedly prescribed by the doctor, but in reality it was the billing department's choice. RELATOR overheard that billers were told to do quick "test claims" and always pick the formula with the greatest amount of reimbursement beyond actual acquisition cost. The billers, most of whom were in their 20s and 30s, were quite competitive and aggressive in finding higher-paying covered formulas and would often "high-five" each other when successful as RELATOR observed from time to time.

29.     There was a list of doctors maintained by the billing department who had already given DEFENDANTS prior approval to change the formula at will without any need to contact the doctor's office and allow SMART's billing department to falsely state that the prescription change was by "verbal order" of these particular doctors. This list was created by SMART managerial personnel under heading "CAN MAKE CHANGE TO RX W/OUT CONTACTING OFFICE." It is illegal for a prescription to be changed without having the approval of the prescribing practitioner. It is also illegal for a billing technician, not acting under the direct supervision of a licensed pharmacist, to have contact with the prescribing practitioner and effect a change in a prescription. The list also contained the names of other doctors for whom approval of a prescription change could be obtained by having the billing department contact the SMART sales

representative who serviced those particular doctors as opposed to the physician or one of his or her authorized employees. This list of named doctors and the sales representative has been turned over to the United States Attorney to determine the relationship, financial or otherwise, between the named doctors and DEFENDANTS.

30. Doctors were being repeatedly requested by SMART to change the prescribed formula to keep up with the change in reimbursement rates for the various compounded medications. Many of these doctors complained to SMART about this supposed, constant need to change the prescribed formulas. To avoid fraying relations with these physicians - yet wishing to still maximize profits by choosing the formula that had the highest reimbursement rate as against actual acquisition costs, SMART managerial personnel, including Kerri McAdoo, Director of Pharmacy, and Chip Hyers, Director of Sales, discussed in or about December, 2015 a scheme by which it would no longer be necessary for the billing department-created prescription to be faxed to the doctors on a repeated basis. Instead, they discussed scanning into the patient's file a billing department-created prescription form (such as Exhibit 2) signed by the physician prior to the billing department's circling the particular compound being used to fill and bill the prescription as had been the existing practice. (See paragraph 24, supra). The non-circled prescription form could then be printed at will and thereafter used to change the formulation as may be required to maximize profits without the doctor's knowledge or approval of the change and, more importantly, without any need to contact the physician to obtain his signature. It is not known at this time whether this particular scheme was ever utilized by DEFENDANTS. Upon further discovery, RELATOR and the United States reserve the right to amend this complaint to include such allegations regarding these additional falsely executed prescription forms as may be appropriate.

31. In or about the latter part of 2015, RELATOR learned of a major compounding pharmacy in the Jacksonville area being pursued by the Department of Justice and ultimately closing down. There was also some media attention given to settlements obtained by the United States Attorney against other compounding pharmacies for defrauding TriCare. It was at was at this point that the owners of SMART, BALOTIN and SCOGINS, started trying to bring the pharmacy into compliance. The hired a compliance officer, Bert Duffy, from one of the pharmacies, Medimex, which had been pursued by the Government. In December 2015, RELATOR and other SMART employees were required to sign a form stating that SMART had never asked anyone to do anything wrong. The form also required all employees to attest that they had witnessed no wrongdoing at the pharmacy which, of course, was an untrue statement. Upon information and belief, this was an effort by DEFENDANTS to neutralize any inculpatory testimony that might be given by SMART employees in later proceedings brought against DEFENDANTS.

## COUNT I AGAINST ALL DEFENDANTS UNDER SECTION 3729(a)(1)(b)

32. RELATOR incorporates and realleges paragraphs 1 through 31 as though more fully set forth herein.

33. Beginning at a time prior to December 2014 and continuing through at least the time of RELATOR's termination on March 8, 2016, each of the DEFENDANTS knowingly made, used, or caused to be made or used, a false record or statement material to a false or fraudulent claim, to wit, the billing department-created prescription forms as reflected in Exhibits 1 through 3. These prescription forms were false on the grounds that they were (i) signed by the physician under false pretenses with respect to SMART's statements regarding lack of insurance coverage or the need "to optimize therapy;" (ii) signed by a SMART billing technician falsely indicating that

verbal orders have been received from the prescribing practitioner or some authorized individual in the prescribing practitioner's office; or (iii) the particular compound was chosen by a non-pharmacist SMART billing technician and not the prescribing practitioner, all in violation of Section 3729(a)(1)(B) of the False Claims Act.

34. The precise number of false records or statements material to a false or fraudulent claim is unknown to RELATOR at this time and is otherwise in the exclusive knowledge of DEFENDANTS. Upon information and belief, the number of times such false records or statements material to a false or fraudulent claim were made, used or caused to be made or used, is in the many thousands based upon the volume of business at SMART and the prevalence of the practice of using such false records or statements which occurred on a daily basis and as a matter of routine practice. The source of this information and belief is RELATOR's knowledge of SMART's billing practices derived from his employment by SMART, his conversations with members of the billing department, and his observations of the documents and events referenced herein.

35. As a result of the conduct of DEFENDANTS as described in this Count, the United States has suffered actual damages.

## COUNT II AGAINST ALL DEFENDANTS UNDER SECTION 3729(a)(1)(A)

36. RELATOR incorporates and realleges paragraphs 1 through 31 and paragraphs 33 and 34 as though more fully set forth herein.

37. Beginning at a time prior to December 2014 and continuing through at least the time of RELATOR'S termination on March 8, 2016, each of the DEFENDANTS knowingly presented or caused to be presented a false or fraudulent claim for payment or approval in that DEFENDANTS made a request or demand for money and presented such request or demand to

an officer, employee, or agent of the United States, including any fiscal intermediary of the Medicare or TriCare programs, through an electronic medium claims system or such other approved means, where such money is to be spent or used on the Government's behalf or to advance a Government program or interest, to wit, the Medicare and TriCare programs, and where the United States Government provides or has provided any portion of the money requested or demanded or will reimburse the recipients of such claim for any portion of the money which is requested or demanded, all in violation of Section 3729(a)(1)(A) of the False Claims Act. Said claims were false or fraudulent because such claims were predicated upon SMART's billing department-created prescription forms which were signed by the prescribing practitioner under false pretenses or created by SMART under false pretenses as more fully described in paragraph 33 as well as paragraphs 17 through 31 of this Complaint.

38. The precise number of the false or fraudulent claims is unknown to RELATOR at this time and is otherwise in the exclusive knowledge of DEFENDANTS. Upon information and belief, the number of times such false or fraudulent claims were knowingly presented, or caused to be presented, by DEFENDANTS is in the many thousands based upon the volume of business at SMART and the prevalence of the practice of filing such false and fraudulent claims. The source of this information and belief is RELATOR's knowledge of SMART's billing practices derived from RELATOR's employment by SMART, his conversation with members of the billing department, and his observations of the documents and events referenced herein.

39. As a result of the conduct of DEFENDANTS as described in this Count, the United States has suffered actual damages.

## COUNT III AGAINST ALL DEFENDANTS UNDER SECTION 3729(a)(1)(B)

40. RELATOR incorporates and realleges paragraphs 1 through 31, paragraphs 33 and 34, and paragraphs 37 and 38 as though more fully set forth herein.

41. Beginning at a time prior to December 2014 and continuing through at least the time of RELATOR'S termination on March 8, 2016, each of the DEFENDANTS combined, conspired and agreed with each other and with other persons unknown to RELATOR at this time to commit violations of subparagraph (A) and (B) of Section 3729(a)(1) of the False Claims Act, all in violation of Section 3729(a)(1)(C) of the False Claims Act.

42. In furtherance of such conspiracy and to effect the object of said conspiracy, one or more of the DEFENDANTS committed, or caused to be committed, in the Middle District of Florida and elsewhere, the overt acts identified in paragraphs 17 through 31 and paragraphs 33, 34, 37 and 38.

43. As a result of the conduct of DEFENDANTS as described in this Count, the United States has suffered actual damages.

## DEMAND FOR RELIEF

RELATOR, acting on behalf of United States, hereby demands and seeks that judgment be entered in favor of United States and against each of the DEFENDANTS jointly and severally as follows:

1. Under Counts I through III, for compensatory damages incurred by the United States and trebled;

2. For civil penalties of not less than $5,500 and not more than $11,000 for each false statement, record and claim, as adjusted by the Federal Civil Penalties Inflation Adjustment Act of 1990, made or caused to be made, or conspired to be made, by DEFENDANTS.

3. For interest on the above treble damages from the date on which the damages were sustained and interest on the civil penalties from the date on which this Complaint is served upon DEFENDANTS; and

4. For such other and further relief as may be requested by the United States, including injunctive relief, as this Court deems just and fair.

## REQUEST FOR ADDITIONAL RELIEF

In addition, RELATOR, acting on his own behalf, hereby demands and seeks that an award be made in his favor as follows:

1. For 25% of the proceeds collected by the United States if the Government intervenes;

2. For 30% of the proceeds collected on behalf of the United States if the Government does not intervene;

3. For 25% of the proceeds collected by the United States should the Government elect to pursue its claim through any alternate remedy, including any administrative proceeding, as set forth in Section 3730(c)(5) of the False Claims Act;

4. For all costs and expenses incurred by RELATOR in this action, including his reasonable attorney fees; and

5. For such other and further relief as this Court deems just and fair.

## DEMAND FOR TRIAL BY JURY

RELATOR, pursuant to Rule 38 of the Federal Rules of Civil Procedure, hereby demands trial by jury on all such issues so triable as a matter of right.

Dated: March 31, 2016                                    Respectfully submitted,

*(signature)*

_____
Stephen J. Calvacca, Esquire
Florida Bar No.: 561495
David Haas, Esquire
Florida Bar No.: 494674
NeJame Law, P.A.
189 S. Orange Avenue, Suite 1800
Orlando, Florida 32801
Telephone: (407) 500-0000
Facsimile: (407) 802-1656
Florida Bar No.: 561495
Attorneys for Plaintiff-Relator